UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

_____
                                        )
UNITED STATES OF AMERICA                )
                                        )
        v.                              )      CR. No. 11-035-S
                                        )
DONATO ROGELIO MAYEN-MUNOZ.             )
_____ )

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

Defendant Donato Rogelio Mayen-Munoz has moved to suppress
tangible evidence seized from his person as fruits of an arrest
unsupported by probable cause. The Court conducted an
evidentiary hearing on October 24, 25, and 28 and November 7,
2011. After considering the evidence and arguments of the
parties, for the reasons set forth below, the motion is denied.

I.  Findings of Fact

On March 1 and 2, 2011, members of the Pawtucket Police
Department (PPD) assisted agents of the Drug Enforcement
Administration (DEA) in conducting surveillance of one Richard
Morel, as part of an ongoing narcotics investigation. Morel had
been previously convicted of a drug offense in Rhode Island in
August of 2002; that transaction involved over half a kilogram
of cocaine, for which Morel served nearly five years. The

surveillance team believed Morel was more recently involved in multi-kilogram cocaine distribution and heroin deliveries.

On March 1, detectives observed Morel travel to three small motor lodges and hotels in Rhode Island and nearby Massachusetts. At each stop, he dropped off a different individual.[1] PPD Detectives Scott Sullivan and Dennis Smith both regarded Morel's comings and goings as indicative of large-scale drug trafficking activity because it separated participants from each other and law enforcement.

At approximately 12:45 p.m. the next day, March 2, detectives observed Morel pick up Defendant Mayen-Munoz[2] near the Providence train station. Detectives followed as Morel drove to his residence at 29 Wealth Avenue in Providence. From there, Morel and two other individuals drove to a Penske truck leasing location where they rented a truck. They then returned, with the truck, to Morel's residence.

Later that afternoon, Defendant drove the truck from Morel's residence to a Motel 6 in Warwick. Detectives Sullivan and Smith were familiar with this hotel as a result of conducting five or six large-scale narcotic arrests and seizures

---

[1] Neither Morel, nor any of these other individuals, was arrested as a result of this investigation.

[2] None of the detectives and officers had seen Defendant prior to this day.

there.  Co-defendants Geraldo Alavez and Jose Luis Martinez-Garcia joined the Defendant from the hotel, and Defendant drove all three in the Penske truck to a Home Depot in nearby Attleboro, Massachusetts; there, Defendant purchased two pairs of work gloves.

From the Home Depot, the group drove (with Alavez at the wheel) to R&L Carriers, a commercial trucking facility in Seekonk, Massachusetts.  En route, the truck made a brief stop at a parking lot on the corner of Benefit and Calder in Pawtucket, Rhode Island.  The detectives could not observe what occurred during the stop.[3]

After the brief stop, the Penske truck proceeded to R&L Carriers.[4]  Using binoculars, Detective Smith observed two individuals leave the Penske truck and enter the office building, but he could not identify them.  A few minutes later, Smith observed the two individuals return to the truck and drive it to an area within R&L outside of Smith's view.  Approximately

---

[3] The subsequent interrogation of Martinez-Garcia revealed that Defendant exited the truck during this brief stop and accordingly, was not in the truck when it went to R&L Carriers. According to Martinez-Garcia, the plan was to pick up Defendant at the same location on their way back from R&L.

[4] Detective Sullivan testified that R&L Carriers was also familiar to law enforcement because of a prior seizure of 1,500 pounds of marijuana involving an R&L Carriers truck.

fifteen minutes later, the Penske truck left R&L and headed back toward Pawtucket.

After the truck left R&L, Detective Smith (who was in an unmarked vehicle) called Sergeant Lefebvre and asked him to respond to the area of Benefit and Central in Pawtucket in his marked, police cruiser. Smith told Lefebvre that he believed the truck contained a large quantity of narcotics and asked him to stop the truck if he observed a traffic violation. Both Smith and Lefebvre also called Officer Ernest Pendergrass, a K-9 officer with the PPD, to put him on notice that he might be needed.

Lefebvre picked up the trail on Benefit Street and followed directly behind the Penske truck; when the truck made a sharp, abrupt left turn without using its turn signal on to Calder Street, Lefebvre activated his overhead lights and followed the truck as it turned into the driveway of a private residence at 96 Calder Street.

As Lefebvre approached the Penske truck, co-defendant Alavez emerged and started walking toward him. Lefebvre told Alavez to stop and asked him for his license and registration. Alavez appeared nervous. As Alavez was looking for paperwork in the truck, Lefebvre heard the sound of a door shut. He then looked inside the vehicle and noticed it was empty. This

concerned Lefebvre because he was told by Detective Smith to expect three individuals inside the truck.

Lefebvre asked Alavez about the whereabouts of his passengers, but he would not answer. Alavez eventually produced a California identification card, but no license. Lefebvre then arrested Alavez and placed him in the back of his police car. Lefebvre notified dispatch of the car stop and called Officer Pendergrass to have him respond immediately.

Pendergrass arrived within several minutes, and Lefebvre asked him to send Bak, his K-9 police dog, into the back of the truck. Lefebvre testified that his request was motivated by both a concern that there might be somebody in the back of the truck and by a desire to search for narcotics. When pressed by the Court as to whether he really believed that an individual had gotten into the back of the truck, Lefebvre conceded that there was a solid wall between the passenger compartment and the back, but maintained that he honestly did not know whether someone was in the back.

Pendergrass testified that, when he arrived on scene, Lefebvre informed him that somebody could be in the back of the truck. On cross-examination, Officer Pendergrass insisted that they were initially concerned that someone was in the back of the truck, not with searching for narcotics; his police report,

however, stated that Lefebvre requested he conduct a search for possible narcotics and did not mention a search for people.

Officer Pendergrass testified that he gives Bak different commands depending on whether he wants him to search for humans or for narcotics. Bak searches for humans first, and Officer Pendergrass's ability to call him off before he searches for narcotics would depend upon the strength of the potential narcotics scent.

At approximately 7:20 p.m., Officer Pendergrass placed Bak inside the back of the Penske truck, without giving any particular command. Bak's breathing and body language changed, and Pendergrass gave him the command to search for narcotics; Bak alerted to the presence of narcotics almost immediately. Officer Pendergrass returned Bak to his police vehicle at approximately 7:25 p.m.[5]

Lefebvre then communicated to Detective Smith that the dog had alerted on a pallet inside the truck and that the driver was in custody. This was his first communication with Smith since before the traffic stop. Thereafter, another detective drove the truck to a secure evidence facility.

_____

[5] The 7:20 to 7:25 p.m. timeframe is derived from Officer Pendergrass's police report. He testified that the timeframe is an approximation, that searches generally take between one and three minutes, and that he always allots extra time. Pendergrass testified that Bak could have alerted to the drugs either before 7:25 or after 7:25 p.m.

The following events began to unfold at the same time
Sergeant Lefebvre initiated the traffic stop. After the Penske
truck was stopped at 96 Calder, Detective Smith observed co-
defendant Martinez-Garcia exit the truck and walk to the corner
of Benefit and Newport. Smith then spotted Defendant standing
on a different corner of the same intersection.

At approximately 7:09 p.m.,[6] Detective David Medeiros of the
PPD radioed, indicating that he saw Martinez-Garcia enter the
Shell station at Benefit and Newport. Medeiros detained him
shortly thereafter.

Also contemporaneous with the traffic stop, Detective
Sullivan received a transmission indicating that Defendant was
walking north on Newport Avenue. He soon spotted Defendant,
sitting inside a Honey Dew Donut shop, on the corner of Cottage
and Newport -- only blocks from the location of the traffic stop
and the Shell station where Martinez-Garcia was arrested.

At 7:21 p.m., with Martinez-Garcia now in custody,
Detective Medeiros radioed to Officer Geoffrey Metfooney of the
PPD, instructing Metfooney to look for Defendant. At 7:22 p.m.,
another officer radioed that Defendant was inside the Honey Dew,
and Medeiros instructed Metfooney to "get in there, he's gonna

_____

[6] All times, unless otherwise indicated, are based upon
government's exhibit 10, the police dispatch calls and
accompanying transcript.

7

run," to which Metfooney responded: "We got the exits covered."
At 7:23 p.m., Medeiros instructed Metfooney to transport
Defendant to the main station. Officer Metfooney testified
that, by the time of the 7:23 call, Defendant was handcuffed,
but Metfooney did not know if they were escorting Defendant out
of the Honey Dew or placing him into the patrol vehicle when he
received that call. Based on the timing of these calls and the
testimony of the officers, it is clear that Defendant was taken
into custody between 7:22 and 7:23 p.m.

Detective Medeiros testified that he did not know whether
the dog had alerted on the drugs in the Penske truck before
Defendant was taken into custody. Detective Sullivan also
testified that, if Defendant had left the donut shop prior to
the arrival of the patrol officers, he would not have let
Defendant walk away and would have detained him himself.

At 7:27 p.m., Metfooney transported Defendant to the
station, where Defendant was searched. Several cell phones, a
plane ticket, and a large sum of money were seized from his
person.

With Defendant detained, Detective Medeiros responded to
the traffic stop at 96 Calder, where the K-9 was already outside
of the truck. The truck was taken to an evidence holding
facility to be searched and inventoried. Bales were found,

which later field tested positive for marijuana. Gloves were also found in the truck.

## II.  Discussion

### A.  <u>Terry</u> Stop or <u>De Facto</u> Arrest

The government first argues that the initial detention of the Defendant was a <u>Terry</u> stop that did not mature to an arrest until he was transported to the police station.

According to Metfooney, Officer Gallison[7] entered the Honey Dew, approached Defendant, announced his presence as a police officer, informed Defendant that he would need to detain him for questioning, and handcuffed him. Metfooney secured the perimeter of the Honey Dew and did not enter until Gallison made contact with Defendant. Both officers escorted Defendant to Metfooney's patrol car, searched him incident to arrest, and transported him to the station.

Officer Metfooney testified that Defendant was placed into custody without incident, did not ask any questions or offer any resistance, and was fully cooperative and compliant. Metfooney also testified that he did not advise Defendant of his <u>Miranda</u> rights, question him, or tell him why he was under arrest. There was no conversation between him and Defendant.

---

[7]  Officer Gallison did not testify at the supression hearing.

A patron who witnessed the arrest at the Honey Dew stated that the only words spoken by the officers when they entered the establishment were "put your hands behind your back," prompting both the patron and his friend to mistakenly comply.

"There is no scientifically precise formula that enables courts to distinguish between investigatory stops . . . and . . . 'de facto arrests.'" United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994); see also United States v. Pontoo, No. 10-2455, 2011 WL 6016141, at *7 (1st Cir. Dec. 5, 2011) (observing "no bright line that distinguishes" Terry stop from de facto arrest). The line between a Terry stop and a de facto arrest is often "drawn by asking whether 'a reasonable man in the suspect's position would have understood his situation' as being an arrest." Pontoo, 2011 WL 6016141, at *7 (quoting United States v. Acosta-Colon, 157 F.3d 9, 14 (1st Cir. 1998)). At the same time, "it is an oversimplification to suggest that every case will fall along this continuum." Pontoo, 2011 WL 6016141, at *7. Accordingly, in borderline cases, or in cases where arrest-like features are employed, the Court must "assess the totality of the circumstances" of the encounter in order to conduct a fact-specific inquiry. Morelli v. Webster, 552 F.3d 12, 20 (1st Cir. 2009); see also Pontoo, 2011 WL 6016141, at *7.

Factors to consider include: length of the detention; restrictions placed on the individual's movement, by use of

handcuffs or other means; use of force, such as forcing the suspect to the ground; information conveyed (or not conveyed) to the detainee, such as informing the detainee that he or she is under arrest or not under arrest or providing <u>Miranda</u> warnings; the number of law enforcement officers present at the scene; whether weapons were brandished; whether the encounter took place in a neutral location; and whether the suspect was transported to another location during the course of the detention. <u>See, e.g.</u>, <u>Pontoo</u>, 2011 WL 6016141, at *7; <u>United States v. Fornia-Castillo</u>, 408 F.3d 52, 63 (1st Cir. 2005); <u>Flowers v. Fiore</u>, 359 F.3d 24, 30-32 (1st Cir. 2004); <u>United States v. Taylor</u>, 162 F.3d 12, 22 (1st Cir. 1998); <u>Acosta-Colon</u>, 157 F.3d at 15-21. No single factor is legally dispositive. <u>Flowers</u>, 359 F.3d at 31-32. To the extent that any arrest-like features are employed, the government must "identify <u>specific</u> facts or circumstances which could have led the acting law enforcement officers reasonably to believe that the use of such measures was required to effectuate safely the completed investigation." <u>Acosta-Colon</u>, 157 F.3d at 21 (emphasis in original).

The government's argument boils down to this: the Defendant's detention was a valid <u>Terry</u> stop from the time of the initial encounter at 7:22 or 7:23 to the point when Officer Metfooney drove him to the station at 7:27 p.m. It is true that

a number of the typical factors cut against de facto arrest: the duration was short (no more than five minutes); there was no use of force; Defendant was not told he was under arrest, nor was he Mirandized; there were only two officers at the scene; no weapons were brandished; and the encounter took place in a public, neutral location.

Defendant was, however, handcuffed almost immediately -- no later than 7:23 p.m.  Although "traditionally associated with an arrest," United States v. Mohamed, 630 F.3d 1, 6 (1st Cir. 2010), the use of handcuffs "does not automatically convert the encounter into a de facto arrest." Acosta-Colon, 157 F.3d at 18.  Nonetheless, the use of handcuffs, "being one of the most recognizable indicia of a traditional arrest, substantially aggravates the intrusiveness of a putative Terry stop," id. (internal quotation marks and citation omitted), and the burden of showing the necessity of their use falls squarely on the government:

> [I]t must be able to point to some specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to undue risk of harm.

Acosta-Colon, 157 F.3d at 19 (emphasis in original); see also Mohamed, 630 F.3d at 6-7.  Factors include whether the suspect was "uncooperative, belligerent, or showed any perceptible

inclination to put up resistance or become violent" and whether the officers "harbored an _actual_ suspicion" that the suspect was armed. Acosta-Colon, 157 F.3d at 19 (emphasis in original); see also United States v. Meadows, 571 F.3d 131, 141 (1st Cir. 2009).

In this case, the Government has not met its burden. Defendant did not resist his detention -- he was cooperative, compliant, and placed into custody without incident. Furthermore, that Defendant was suspected of drug trafficking is not enough to justify a belief that he was armed; such a "factually unanchored justification . . . is generalizable to virtually _every_ investigatory stop involving a drug suspect." See Acosta-Colon, 157 F.3d at 19 (emphasis in original). And while the officers' belief that Defendant had fled from the scene of the traffic stop is a relevant consideration, no evidence was offered that would support a belief or suspicion that Defendant was armed. See Meadows, 571 F.3d at 142-43.

The same can be said for the relocation of Defendant to a patrol car. The government must "point to _some_ specific fact or circumstance that could have permitted law enforcement officers reasonably to believe that relocating the suspect . . . was necessary to effectuate a safe investigation," and cannot rely on "bald assertions" for its justification. Acosta-Colon, 157 F.3d at 17 (emphasis in original). The government has offered

no evidence to suggest Defendant's relocation was motivated by safety concerns.

Finally, even if the government could show that the use of these arrest-like measures was justified, wholly absent from Defendant's initial detention was any sort of investigation, questioning, or confirming or dispelling of suspicions -- the very purposes for which these lesser-intrusions are permitted under the Fourth Amendment. See United States v. Trueber, 238 F.3d 79, 91-92 (1st Cir. 2001) ("[Terry] permits officers to 'stop and briefly detain a person for investigative purposes' and 'diligently pursue[] a means of investigation . . . likely to confirm or dispel their suspicions quickly.'" (emphases added) (internal citation omitted)); see also Pontoo, 2011 WL 6016141, at *5, *8.

For all of these reasons, as of 7:23 p.m., when Defendant was handcuffed, his detention amounted to an arrest.

B.    Probable Cause

The Court must next consider whether, "in light of the totality of circumstances," the arrest was supported by probable cause. See United States v. Torres-Maldonado, 14 F.3d 95, 105 (1st Cir. 1994) (quoting United States v. Uricoechea-Casalles, 946 F.2d 162, 165 (1st Cir. 1991); see also United States v. Reyes, 225 F.3d 71, 75 (1st Cir. 2000). The government "bears the burden of establishing that, at the time of the arrest, the

facts and circumstances known to the . . . officers were sufficient to warrant a reasonable person in believing that the individual had committed or was committing a crime." <u>Reyes</u>, 225 F.3d at 75. The government need not present evidence sufficient to convict Defendant; what is required is "merely enough to warrant a reasonable belief that he was engaging in criminal activity." <u>Id.</u>; <u>see also</u> <u>Torres-Maldonado</u>, 14 F.3d at 105. Since Officers Metfooney and Gallison were unaware of the events that led up to the encounter at the Honey Dew, the knowledge of facts supporting probable cause would need to be imputed to them under the collective knowledge doctrine. <u>See, e.g.</u>, <u>United States v. Barnes</u>, 506 F.3d 58, 63 (1st Cir. 2007) ("[R]easonable suspicion can be imputed to the officer conducting a search if he acts in accordance with the direction of another officer who has reasonable suspicion.").

Crucial to the probable cause inquiry is whether Bak alerted to the presence of narcotics in the Penske truck prior to Defendant's arrest. <u>See</u> <u>United States v. Brown</u>, 500 F.3d 48, 57 & n.3 (1st Cir. 2007) (noting that reliable canine alert sufficient for probable cause). The following is an excerpt of a timeline of events, based upon the evidence, provided by the government:

**7:20(*appx*)      Officer Pendegrass [sic] notes K-9 Bak in service.**

7:21(*Radio*)       "Looking for male, Hispanic, white jacket, black stripes" (Mayen Munoz).

7:22(*Radio*)       "He's at the Honey Dew."

**7:22:50(*Radio*) Honey Dew exits are covered.**

**7:23(*appx*)      BAK alerts on crates inside the Penske truck.[8]**

**7:23(*appx*)      Mayen Munoz placed in handcuffs inside the Honey Dew.**

**7:23:26(*Radio*) Instruction to take Mayen Munoz into custody.**

**7:25(*appx*)      Officer Pendergrass notes K-9 Bak out of service.**

Assuming that this timeline represents a realistic assessment of what transpired when, in the light most favorable to the government, and given that the unanimous testimony of the detectives and officers is that they cannot say, even in hindsight, which happened first, there is no basis from which the Court could conclude that Bak alerted <u>before</u> Defendant's arrest. Considering the government's burden, the Court cannot find that the K-9's alert was a "fact[] and circumstance[] known" to any of the detectives or officers prior to Defendant's arrest. See <u>Reyes</u>, 225 F.3d at 75; <u>see also</u> 2 Wayne R. LaFave, <u>Search and Seizure A Treatise on the Fourth Amendment</u> § 3.5(b), at 282 (4th ed. 2004) (noting that "cases assume that the burden

---

[8] The precise time of Bak's alert is the only aspect of the government's timeline for which there is no evidentiary support. It is undisputed, however, that Officer Pendergrass's report suggests that the alert occurred between 7:20 and 7:25 p.m.

is on the prosecution to show probable cause <u>at the source</u>" in collective knowledge doctrine situations) (emphasis added).

Accordingly, the Court must determine whether, in the absence of the K-9 alert, the facts and circumstances known to the officers, "in light of the totality of circumstances," are sufficient to establish probable cause at the time of Defendant's arrest. See <u>Torres-Maldonado</u>, 14 F.3d at 105.[9] The

_____

[9] With respect to the collective knowledge doctrine, Defendant urges the Court to recognize a distinction between vertical collective knowledge -- under which the knowledge of an instructing officer can be imputed to an acting officer -- and horizontal collective knowledge -- under which the imputed knowledge can be aggregated from among various officers and does not need to be derived from an instructing officer. See <u>United States v. Massenburg</u>, 654 F.3d 480, 491-96 (4th Cir. 2011). <u>See generally</u>, 2 Wayne R. LaFave, <u>Search and Seizure A Treatise on the Fourth Amendment</u> § 3.5(b)-(c) (4th ed. 2004). While some case law suggests that the First Circuit would adopt, and perhaps has adopted, such a distinction, recent case law suggests the contrary. <u>Compare</u> <u>United States v. Barnes</u>, 506 F.3d 58, 63 (1st Cir. 2007) ("[R]easonable suspicion can be imputed to the officer conducting a search if he acts <u>in accordance with the direction of another officer</u> who has reasonable suspicion." (emphasis added)) <u>with</u> <u>United States v. Verdugo</u>, 617 F.3d 565, 573 (1st Cir. 2010) ("[T]he collective knowledge of the <u>agents working with</u> MacIsaac on the investigation is attributable to him when determining whether the search was justified." (emphasis added)). The Court would only need to resolve this issue if it determined that the K-9 had alerted to the drugs prior to Defendant's arrest because Detective Medeiros, the instructing officer, clearly did not have that information at the time of the arrest. However, given that the probable cause determination must rest solely on information that was known to Detective Medeiros at the time of

evidence establishes that the following was known by the time of Defendant's arrest: Defendant was picked up by Morel, the target of a DEA investigation, and an individual known for prior large-scale drug trafficking, who engaged in a pattern of behavior consistent with large-scale drug trafficking just the day before he picked up Defendant; Defendant drove a Penske truck, rented by Morel, to a hotel where he picked up Alavez and Martinez-Garcia; he then drove all three to a Home Depot where he purchased two pairs of work gloves; the Penske truck went to R&L,[10] after which it was stopped by Sergeant Lefebvre; Martinez-Garcia fled the scene of the traffic stop; and Defendant was

---

the arrest, it would be imputed to Officers Gallison and Metfooney under either theory.

[10] Defendant makes much of the fact that he was not in the truck when it went to R&L, but probable cause requires that police officers have "information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." United States v. Pontoo, No. 10-2455, 2011 WL 6016141, at *9 (1st Cir. Dec. 5, 2011) (emphasis added) (quoting United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997)). Here, none of the detectives saw anyone leave the Penske truck when it pulled over en route to R&L. Accordingly, "a reasonably prudent person would believe" that Defendant was still in the truck when it went to R&L and at the time of the traffic stop. See id. Thus, when Defendant was observed on the side of the road nearby, it was reasonable for the detectives to conclude that he had fled and to draw inferences of guilt. See id.; see also United States v. Benedetti, 433 F.3d 111, 116 (1st Cir. 2005) ("Given an adequate factual predicate, . . . evidence of a criminal defendant's flight is generally thought to be probative of his or her consciousness of guilt.").

observed on the side of the road, mere blocks from where the truck was stopped.[11]

The government is correct that the Court cannot employ a "divide-and-conquer approach" in its probable cause assessment, see United States v. Ramos, 629 F.3d 60, 65-66 (1st Cir. 2010), and it does not do so here. Yet, the sum of what was reasonably known to the detectives, based on what they personally observed and the inferences they drew, yields a quantum of information that is certainly enough to justify suspicion, but short of probable cause.

C.  Inevitable Discovery

The government argues in the alternative that, even if Defendant's arrest was unsupported by probable cause, the evidence seized from his person that he seeks to suppress would still be admissible pursuant to the inevitable discovery doctrine.

---

[11] Without repeating all of them here, the Court credits the inferences drawn by the detectives, based on their experience, with respect to Morel, R&L, the pattern of behavior that they observed throughout the day, and the flight of both Defendant and co-defendant Martinez-Garcia.  See United States v. Wright, 582 F.3d 199, 207 (1st Cir. 2009) ("The Supreme Court has instructed courts to afford 'due weight' to the inferences made by police officers based on their 'experience and expertise.'" (quoting Ornelas v. United States, 517 U.S. 690, 699 (1996))).

"Evidence which comes to light by unlawful means nonetheless can be used at trial if it ineluctably would have been revealed in some other (lawful) way." Zapata, 18 F.3d at 978. To determine whether the inevitable discovery doctrine applies, the Court employs the following three-part test:

> first, whether the legal means by which the evidence would have been discovered was truly independent; second, whether the use of the legal means would have inevitably led to the discovery of the evidence; and third, whether applying the inevitable discovery rule would either provide an incentive for police misconduct or significantly weaken constitutional protections.

United States v. Almeida, 434 F.3d 25, 28 (1st Cir. 2006); see also United States v. Crespo-Ríos, 645 F.3d 37, 42 (1st Cir. 2011). The government bears the burden of showing the doctrine's applicability "by reference to demonstrated historical facts and by a preponderance of the evidence." United States v. Infante-Ruiz, 13 F.3d 498, 503 (1st Cir. 1994) (internal quotation marks and citation omitted); see also Almeida, 434 F.3d at 28.

An arrest is independent if "(1) the police, in fact, would have arrested the defendant, even without first having discovered the challenged evidence, and (2) in the absence of the challenged evidence, the officers nevertheless had probable cause to make the arrest. . . ." Almeida, 434 F.3d at 28. Although not a requirement, see United States v. Silvestri, 787

F.2d 736, 746 (1st Cir. 1986), "[t]he fact that legal means of discovery are underway at the time an unlawful search transpires is highly relevant to . . . the inevitable discovery inquiry." Zapata, 18 F.3d at 978 n.6.

Here, as discussed supra, Bak's alert would have been sufficient to establish probable cause. Those means, the K-9 search, were independent of Defendant's arrest because the officers would have arrested him without the evidence he seeks to suppress (the items seized from his person at the station), and they would have had probable cause without its discovery. See Almeida, 434 F.3d at 28. Moreover, the K-9 search was under way at the time of arrest -- Officer Pendergrass and Bak were either already on scene or had been summoned. See Zapata, 18 F.3d at 978 n.6.

With respect to the inevitability prong, the government "must demonstrate, to a high degree of probability, that the evidence would have been discovered." Almeida, 434 F.3d at 29. If Officers Gallison and Metfooney had not detained Defendant, Detective Sullivan would have continued to maintain constant surveillance and would not have let him leave unobserved. Accordingly, it follows that Sullivan could have maintained surveillance for the less than ten minutes it took for Bak to arrive on scene and alert on the drugs, at which time Sullivan

could have arrested Defendant, and the items on his person would have been seized incident to his arrest.

Defendant argues that the government cannot demonstrate "to a high degree of probability" that the items would still have been on his person at that later time.  See Almeida, 434 F.3d at 29.  He also argues that, any finding to the contrary, would be based on pure speculation.

There is, however, "some room for speculation" in an inevitable discovery analysis.  See United States v. Ford, 22 F.3d 374, 379 (1st Cir. 1994) (citing Murray v. United States, 487 U.S. 533, 542 (1988)).  And here, it does not take a great deal of speculation for the Court to conclude that the items would still have been on his person.  Defendant was in an unfamiliar town at nighttime.  He had no apparent connections, no car, and no place to go.  In the less than ten minutes he would have had, if he had left the Honey Dew, he would have been on foot or perhaps could have called a taxi -- in either scenario, surveillance would have been maintained, as it had been throughout the day.

Taken all together, the testimony and evidence established that the evidence would still have been on Defendant's person had they arrested him a few minutes later, thereby satisfying the second prong of the test.  See United States v. Hughes, 640

F.3d 428, 441 (1st Cir. 2011) ("These data points collectively satisfy the second prong of the test.").

Analyzing the third prong requires a case-specific inquiry and "an appreciation of the societal costs of the exclusionary rule." Almeida, 434 F.3d at 29; see also Crespo-Ríos, 645 F.3d at 44. Factors courts have considered are whether there was an "incentive to transgress the defendant's constitutional rights in order to resort to the inevitable discovery doctrine" and whether any failure to adhere to Fourth Amendment standards was intentional, "wholly inadvertent," or "truly egregious." See Hughes, 640 F.3d at 441; Almeida, 434 F.3d at 29; United States v. Pardue, 385 F.3d 101, 108 (1st Cir. 2004); Scott, 270 F.3d at 45. While a constitutional violation as to a third party is not considered in evaluating whether the means were legal for purposes of the first two prongs, such a violation is considered in assessing the third prong of the test. See Scott, 270 F.3d at 45 (noting that there were "two unconstitutional acts, rather than one" and considering Miranda violation of third party in determining whether application of inevitable discovery doctrine provided an incentive for unconstitutional behavior).

Though Defendant's arrest was not supported by probable cause, that unconstitutional act can hardly be characterized as egregious or an intentional transgression of Defendant's rights. See Pardue, 385 F.3d at 108; Scott, 270 F.3d at 45. Detective

Medeiros described the situation as "crazy" -- referring to the fact that the detectives were locating multiple individuals in multiple locations and that safety concerns were amplified because a number of the detectives were in plain clothes and unmarked vehicles.    It follows that Detective Medeiros's instruction to detain Defendant was not premeditated or the result of a deliberative decision analyzing whether the officers had probable cause.   Rather, it was motivated by a desire to get a situation, which had unexpectedly extended the officers' resources to the limit, contained and under control.   Moreover, there was hardly an incentive to transgress Defendant's constitutional rights if the lawful means (the K-9 search) were already under way at 96 Calder.   See Hughes, 640 F.3d at 441; Almeida, 434 F.3d at 29.

Finally, while there was some discussion regarding the constitutionality vel non of the K-9 search, Defendant conceded that he has no standing to present arguments to that effect. And the government pressed a variety of arguments as to why the search was constitutional.   The bottom line is that, even if the Court were to determine that the K-9 search was unconstitutional, that second violation would also not warrant suppression under the third prong.

Detective Smith's testimony suggests that any violation was inadvertent and unplanned.   Like Medeiros, Smith also testified

that there was a lot going on in a short period of time and that an anticipated one-location traffic stop had quickly turned into a three-location stop with multiple suspects fleeing. Smith testified that his original intention was to have Officer Pendergrass conduct an <u>exterior</u> dog sniff around the truck. Furthermore, Officer Pendergrass and Sergeant Lefebvre had legitimate concerns that someone might be in the back of the truck because Lefebvre expected three individuals inside, not one. Finally, the government presented evidence that the search complied with PPD policy and procedure manuals. Taking all of that evidence and testimony together, the actions of the officers and detectives, even if unconstitutional, do not amount to a truly egregious or intentional transgression of co-defendant Alavez's constitutional rights but rather an inadvertent and unplanned response to a quickly developing and complicated situation. <u>See</u> <u>Scott</u>, 270 F.3d at 45 (holding that there was no incentive to violate third party's <u>Miranda</u> rights to obtain evidence against the defendant and that the violation was not "truly egregious").

Accordingly, even though Defendant's arrest was not supported by probable cause, the evidence he seeks to suppress is admissible under the inevitable discovery doctrine.

III. Conclusion

For the foregoing reasons, the Defendant's motion to suppress is DENIED.

IT IS SO ORDERED.

*/s/ William E. Smith*
_____
William E. Smith
United States District Judge
Date: February 13, 2012